**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: September 25, 2025.**

_____
**MICHAEL M. PARKER
UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| KENNETH WAYNE GAWLIK, | § § | CASE NO. 24-51366-MMP |
| DEBTOR. | § § | CHAPTER 12 |
| | § § | |
| GEORGE RAYMOND GAWLIK, JR., | § § | CASE NO. 24-51369-MMP |
| DEBTOR. | § § | CHAPTER 12 |

**OPINION AND ORDER GRANTING AMENDED MOTION TO DISMISS**

**I.   INTRODUCTION**

The Court heard Agnes Ramos's *Amended Motion to Dismiss Chapter 12 Bankruptcy Case* (Case No. 24-51366, ECF No. 109; Case No. 24-51369, ECF No. 106) filed in each of the Debtors' cases[1] and determined the *Amended Motion* should be granted in each case. Argument focused

---

[1] The Court's references to "each Debtor" refers separately to George Gawlik, Jr. and Kenneth Gawlik. This same Opinion and Order will be filed in each Debtor's bankruptcy cases identified in the style.

1

on two issues: (i) whether the Court's *Conversion Orders* precluded Ramos from challenging each Debtor's chapter 12 eligibility and (ii) whether each Debtor's non-farm debt exceeded his farm debt, making each Debtor ineligible for chapter 12.[2]

Because the Court's *Conversion Orders* (converting each Debtor's case from chapter 13 to chapter 12) do not constitute final orders for res judicata purposes (because they do not affect the substantive rights of the parties), those orders do not preclude Ramos from now challenging each Debtor's chapter 12 eligibility.

Without preclusion, the eligibility question centers on whether a majority of each Debtor's debts arise out of each Debtor's farming operations. Because each Debtor owes a judgment debt to Ramos in excess of each Debtor's existing debts, the character of that judgment debt determines each Debtor's eligibility.[3] The judgment debts arise out of a state court lawsuit where a jury determined that each Debtor stole Ramos's cattle and hay and breached fiduciary duties owed to Ramos, among other tortious conduct. The Court finds that cattle rustling, hay theft, and filing a fraudulent record do not arise out of farming operations. Therefore, the portions of the judgment debt arising out of that conduct, which represent a majority of each Debtor's debt, do not arise out of farming operations. Thus, neither Debtor is eligible to be a debtor under chapter 12.

**II.    JURISDICTION AND VENUE**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b). Venue is proper under 28 U.S.C. § 1408 and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This Opinion and Order serves as this Court's findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014.

---

[2] All statutory citations and references are to title 11 of the U.S. Code, unless otherwise noted.
[3] Case No. 24-51366, ECF No. 1, p. 30; ECF No. 109, p. 2; ECF No. 123 ¶ 2; Case No. 24-51369, ECF No. 1, p. 29; ECF No. 122 ¶ 5.

### III. BACKGROUND

While each Debtor filed for bankruptcy under chapter 13 of title 11 of the United States Code, Case Nos. 24-51366 and 24-51369, ECF No. 1, both later converted to chapter 12 cases. Case No. 24-51366, ECF Nos. 20, 27; Case No. 24-51369, ECF Nos. 21, 29. Kenneth Gawlik's schedules reflect that, as of the petition date, he had $908,255.66 in total debts, including a $645,349.66 unsecured debt owed to Agnes Ramos. Case No. 24-51366, ECF No. 1, pp. 27, 30, 32. George Gawlik, Jr.'s schedules reflect that, as of the petition date, he had $1,187,374.20 in total debts, including $854,993.84 in unsecured debt owed to Agnes Ramos. Case No. 24-51369, ECF No. 1, pp. 26, 29, 30.

Pre-petition, Ramos obtained a state court judgment holding George Gawlik, Jr. and Kenneth Gawlik (collectively, the "**Gawliks**") jointly and severally liable for damages based on claims of theft, breach of fiduciary duty, breach of contract, and fraud ("**Judgment Debt**").[4] Ramos's Ex. 1. The state court jury awarded damages jointly and severally against each Debtor totalling about a million dollars, including attorneys' fees and interest. Ramos's Ex. 2. A Wilson County jury found the Gawliks had been stealing cattle and hay from Ramos for years. *Id.* The state court judgment apportioned damages against each Debtor accordingly. For Kenneth Gawlik the judgment awarded $68,500 for breach of fiduciary duty, $394,000 for violating the Texas Theft Liability Act ("**TTLA**"), $161,000 in statutory damages under the TTLA, $21,849.66 in prejudgment interest, $293,450.89 in attorneys' fees, and post-judgment interest at 8.5%. Ramos's Ex. 1, pp. 3–4. For George Gawlik, Jr. the judgment awarded $94,000 for breach of fiduciary duty, $394,000 for TTLA violations, $161,000 in statutory damages under the TTLA, $134,000

---

[4] A portion of the state court judgment also awarded damages against George Gawlik, Sr. That portion of the judgment is irrelevant to this Opinion and Order.

3

for filing a fraudulent record, $71,993.84 in prejudgment interest, $293,450.89 in attorneys' fees, and post-judgment interest at 8.5%.[5] *Id.*

This means, when the Gawliks filed for bankruptcy, Kenneth owed $945,466.03, and George Jr. owed $1,156,598.69, to Ramos. This puts Kenneth's total petition date debt at $1,208,216.90, and George Jr.'s total petition date debt at $1,488,978.90.[6]

At an earlier hearing on each Debtor's *Motion to Convert Case to Chapter 12* (Case No. 24-51366, ECF No. 20; Case No. 24-51369, ECF No. 21), Ramos's counsel hinted that each Debtor might be ineligible for chapter 12 relief because Ramos's Judgment Debt did not qualify as farming operations debt and constituted more than half of each Debtor's debts. At that hearing, the Debtors' proffered testimony that they believed more than half of their debts arose out of farming operations, but no more evidence or argument about that issue occurred at the conversion hearing.[7] Neither the Court's oral ruling, nor its order granting conversion mentioned either Debtor's debts (or the character of those debts) or either Debtor's chapter 12 eligibility. Case No. 24-51366, ECF No. 27; Case No. 24-51369, ECF No. 29 (collectively, the "**_Conversion Orders_**").

Ten months later Ramos's *Amended Motions* in each case fairly presented the eligibility issue and the Chapter 13 Trustee and each Debtor fully briefed and opposed the *Amended Motions*. Each Debtor testified that when each filed for bankruptcy each had a farming operation (although it was unclear when each started their farming operations or whether those operations pre-existed working on Ramos's farming operations), and that Ramos had a farming operation. Ramos,

---

[5] Each Debtor filed for bankruptcy about a month after the state court judgment issued. Since a month passed after the state court judgment was entered and before the petition dates, the Gawliks owed 1/12 of 8.5% interest on the judgment award, which for Kenneth is $6,665.48 and George Jr. its $8,153.96.

[6] This Court later entered non-dischargeability judgments in adversary proceedings brought by Ramos against each Debtor. Adv. Proc. No. 24-05079, ECF No. 24; Adv. Proc. No. 24-05080, ECF No. 16.

[7] The Debtors' counsel's proffer of Kenneth's testimony at that conversion hearing included a statement that "50% of the Debtor's debts outstanding, including the judgment, are a result of the farming operation." George Jr.'s proffer included a statement that "50% of his debts are related to the farming operation." Ramos's counsel questioned neither Debtor on his proffer.

4

Ramos's daughter-in-law, and the Gawliks all testified that the Gawliks ran Ramos's farming operations. At the petition dates, the Gawliks were raising their own cows and growing their own hay on their own land, and they had a hay cutting and bailing business. As of the petition dates, the Gawliks had their own tractors and trailers, and they used that equipment for their own farming operations and to harvest Ramos's hay.

The parties testified about two agreements underlying the Judgment Debt: one involving Ramos's cattle operation and another involving hay harvested and sold on Ramos's land. After Ramos's husband passed, Ramos was contemplating selling much of her farming operations because she could not continue those operations. The Gawliks and their father were interested in acquiring some of Ramos's land but lacked the financial wherewithal to purchase the land and livestock outright. In 2016, the Gawliks and their father proposed a mutually agreeable solution. Rather than buy Ramos's real and personal property (through bank financing or cash purchase) Ramos and the Gawliks signed an agreement through which the Gawliks agreed to take care of Ramos's cows for an hourly fee, which Ramos agreed to apply to an agreed upon purchase price for some of Ramos's real property. Case No. 24-51366, Debtor's Ex. 1 ¶¶ 15–16; Case No. 24-51369, Debtor's Ex. 1 ¶¶ 15–16.

Additionally, the Gawliks and Ramos had an agreement related to harvesting hay on one of Ramos's properties, which called for Ramos and the Gawliks to evenly divide the proceeds of hay sales for hay harvested and bailed by the Gawliks on Ramos's land. *Id.* ¶ 17. Under the agreement, Ramos, and the Gawliks also split the cost of fertilizer evenly.

IV. **ANALYSIS**
    a. **THE PARTIES' ARGUMENTS**

Ramos moves to dismiss the Gawliks' underlying bankruptcy cases, arguing the Gawliks do not qualify as family farmers because virtually all the debt each Debtor lists on his Schedules

5

is represented by the Judgment Debt which does not arise out of each Debtor's farming operation. Ramos argues the Court's *Conversion Orders* are only "a final judgment as to [the] chapter [under which each Debtor's] bankruptcy will proceed," and not a final judgment as to whether the Judgment Debt arises out of each Debtor's farming operation. Case No. 24-51366, ECF No. 125, p. 10; Case No. 24-51369, ECF No. 124, p. 10.

The Debtor, the Trustee, and Capital Farm Credit[8] assert (1) Ramos is precluded (via res judicata and procedural fairness) from raising this eligibility argument by the Court's *Conversion Orders*, and (2) the Debtor qualifies as a family farmer because the Judgment Debt arises out of each Debtor's farming operation.

### b. RES JUDICATA

Res judicata, also known as claim preclusion, "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." ***Test Masters Educ. Servs., Inc. v. Singh***, 428 F.3d 559, 571 (5th Cir. 2005). A claim in a subsequent action is precluded if four elements are met:

(1) the parties are identical or in privity;

(2) the judgment in the prior action was rendered by a court of competent jurisdiction;

(3) the prior action was concluded by a final judgment on the merits; and

(4) the same claim or cause of action was involved in both actions.

***Sacks v. Texas S. Univ.***, 83 F.4th 340, 344 (5th Cir. 2023). To expand on the fourth element, the Fifth Circuit has adopted the transactional test asking whether the two actions are based on the

---

[8] Capital Farm Credit holds a secured claim of $11,472.03 in Kenneth Gawlik's bankruptcy case (Case No. 24-51366, PoC #8-2, p. 2) and a $146,000 secured claim in George Gawlik, Jr.'s. Case No. 24-51369, ECF No. 1, p. 24, PoC #4-1 ($104,074.62), PoC #5-1 ($11,472.03), PoC #6-1 ($18,553.41).

same nucleus of operative facts. *Javery v. Lockheed Martin Corp.*, 765 Fed. App'x 98, 99 (5th Cir. 2019).

Here, the prior actions are the hearings on each Debtor's *Motion to Convert,* at which all the relevant parties (except, Capital Farm Credit) were present. The Court had jurisdiction to enter each *Conversion Order* because the matter was a core proceeding under 28 U.S.C. § 157(b)(2)(A). Therefore, the first two elements of res judicata appear satisfied. The final two require a deeper dive.

### 1. THE FINALITY OF THE COURT'S CONVERSION ORDERS

Were the Court's *Conversion Orders* final, and if so on which issues? Unlike determining the finality of an adversary proceeding order, determining the finality of contested matter orders is complicated by the number of parties and issues considered on each contested matter. For example, an order lifting the automatic stay can be final, while an order denying a motion to lift the stay is not necessarily final. *Cf.* ***Ritzen Group, Inc. v. Jackson Masonry, LLC***, 589 U.S. 35, 37–38 (2020).[9]

---

[9] ***Ritzen*** involved a failed lift stay motion by a creditor (Ritzen) to proceed with state court litigation against the debtor. ***Ritzen***, 589 U.S. at 39. Rather than appeal the bankruptcy court's denial of its lift stay motion, Ritzen proceeded to litigate its claim in the bankruptcy court, ultimately losing and having its claim disallowed. *Id.* at 40. Only then did Ritzen seek to appeal the bankruptcy court's lift stay denial. *Id.* The Supreme Court concluded the bankruptcy court's order denying Ritzen's lift stay motion seeking to litigate in another venue was a "procedural unit anterior to, and separate from, claim-resolution proceedings" within the meaning of 28 U.S.C. § 158(a). *Id.* at 43–44. Thus, the order denying Ritzen's lift stay motion was final and appealable because it left nothing else to be decided on that discrete matter.

An order lifting the stay to allow litigation to move forward or to foreclose on a debtor's property is final because it "fixes the rights and obligations of the parties." *Id.* at 42 (quoting ***Bullard v. Blue Hills Bank***, 575 U.S. 496, 502 (2015)). Lifting the stay in those scenarios changes the status quo because it (1) subjects a debtor and her property to litigation, seizure, or foreclosure, and (2) leaves other creditors without access to their collateral to satisfy their debts or subject to a previously stayed lawsuit. *See* ***Fantasia v. Diodato***, Case No. 23-3742, at *10 (9th Cir. Sept. 15, 2025) (finding reimposing the stay could be a final, appealable order because it changes the status quo channeling litigation back into the bankruptcy court).

An order denying a lift stay motion, however, may not always have the same effect as denial could maintain the status quo, rather than change it. Such as when a debtor may be able to provide adequate protection early in a case (to defeat a motion seeking to lift the stay) but not later in a case due to the collateralized asset's depreciation or insurance expiring, or the debtor's failure (or inability) to make post-petition adequate protection payments.

An order is not final if it is "tentative, provisional, or contingent. . . . Finality will be lacking if an issue of law or fact essential to the adjudication of the claim has been reserved for future determination." RESTATEMENT (SECOND) OF JUDGMENTS § 13 cmt. b (1982). Measuring the finality of a court's order for res judicata purposes mirrors finality for appealability purposes. **Gresham Park Cmty. Org. v. Howell**, 652 F.2d 1227, 1242 (5th Cir. Unit B 1981), *overruled on other grounds by* **Wood v. Orange Cnty.**, 715 F.2d 1543, 1546 (11th Cir. 1983).

"Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." **Ritzen**, 589 U.S. at 37. Fifth Circuit law on the appealability of bankruptcy court orders provides:

(1) orders that conclusively determine the substantive rights of parties are final, and

(2) orders that constitute only a preliminary step in some phase of the bankruptcy proceeding and that do not directly affect the disposition of the estate's assets are interlocutory.

**Foster Sec., Inc. v. Sandoz (In re Delta Servs. Indus.)**, 782 F.2d 1267, 1270–71 (5th Cir. 1986).[10]

In bankruptcy, a final order is a definite judgment that finally disposes of a discrete matter such that it changes the substantive rights of the parties and is appealable. **Tejas Motel, L.L.C. v. City of Mesquite**, 63 F.4th 323, 329–30 (5th Cir. 2023) ("[A] judgment must be both comprehensive and definite. A judgment gets preclusive effect when it settles all rights adjudicated between the parties so that the substantive rights vindicated in it are vested rights, but

---

[10] Although other circuits apply a "pragmatic approach" to the finality of bankruptcy court orders, the Fifth Circuit does not, and we are bound by Fifth Circuit precedent. **Hacienda Recs., L.P. v. Ramos**, 718 Fed. App'x 223, 230 (5th Cir. 2018); *see also* **Albert v. State Bar of California (In re Albert)**, Case Nos. 24-3305, 24-3523, 2025 WL 1452555, at *1 (9th Cir. May 21, 2025); **Sasso v. Boyajian (In re Sasso)**, 409 B.R. 251, 253–54 (1st Cir. B.A.P. 2009); **Gold v. Guberman (In re Comput. Learning Ctrs., Inc.)**, 407 F.3d 656, 660 (4th Cir. 2005).

8

not when outstanding issues remain in the action.") (internal quotations omitted); ***Smith v. Revie (In re Moody)***, 817 F.2d 365, 368 (5th Cir. 1987) ("[A] bankruptcy proceeding is over when an order has been entered that ends a discrete judicial unit in the larger case.").

The Fifth Circuit has not ruled on whether a conversion order is a final order for res judicata purposes. Other courts, however, have found a bankruptcy court's order converting a case from chapter 13 or chapter 11 to chapter 7 is a final order. ***Thomas v. Coppa-Knudson (In re Thomas)***, BAP No. 19-1331, Case No. 14-50333, 2020 WL 5814365, at *5 (9th Cir. B.A.P. Sept. 28, 2020); ***Culp v. Stanziale (In re Culp)***, 550 B.R. 683, 692 (D. Del. 2015); ***In re Rebeor***, 89 B.R. 314, 320–21 (Bankr. N.D.N.Y. 1988); *see also* ***Rosson v. Fitzgerald (In re Rosson)***, 545 F.3d 764, 770 (9th Cir. 2008) (collecting cases), *overruled on other grounds by* ***Nichols v. Marana Stockyard & Livestock Mkt., Inc. (In re Nichols)***, 10 F.4th 956, 961–62 (9th Cir. 2021) (citing ***Law v. Siegel***, 571 U.S. 415 (2014)).[11] Many of those courts said a conversion order was final because it changed the substantive rights of the debtor and creditors by changing the case from a reorganization to a liquidation. *See, e.g.*, ***Culp***, 550 B.R. at 692.

Here, the Court's *Orders* converting each of the Debtor's cases from a reorganization proceeding under chapter 13 to a reorganization proceeding under chapter 12 did not substantively change the rights of each Debtor or his creditors. Conversion did not change the status quo; each case remains in bankruptcy and each Debtor and their property remain subject to the automatic

---

[11] Other orders not finally deciding a bankruptcy case, such as plan confirmations, and contempt orders, are considered final orders for res judicata purposes because of their effect on the parties' substantive rights. ***Ries v. Paige (In re Paige)***, 610 F.3d 865, 871–72 (5th Cir. 2010) (collecting cases stating default judgments, contempt orders, and orders allowing proofs of claim are final orders); ***Eubanks v. F.D.I.C.***, 977 F.2d 166, 170 (5th Cir. 1992) (concluding confirmation orders are final orders); ***Hendrick v. Avent***, 891 F.2d 583, 586 (5th Cir. 1990) (holding that an order authorizing a sale of estate property is a final order); ***In re Reagor-Dykes Motors, LP***, 613 B.R. 878, 887 (Bankr. N.D. Tex. 2020) (stating an order approving a settlement under Bankruptcy Rule 9019 is a final order); ***In re Chesapeake Contractors, Inc.***, 413 B.R. 254, 259 (Bankr. D. Md. 2008) ("An order that fully and finally decides the matter set forth in a motion for relief from stay, such as an order after a final hearing which order denies all relief from the automatic stay, is a final order for purposes of the application of the doctrine of res judicata as to a subsequent motion brought upon the same transactional facts and legal issues.").

stay and the oversight of a trustee. Conversion did not change each case from a reorganization to a liquidation. Each case remains a reorganization; in fact, in this District, the Chapter 13 Trustee and Chapter 12 Trustee are the same person. The *Conversion Orders* did not change the disposition of the Gawliks' assets or otherwise affect the rights of interested parties. Neither the Gawliks nor the Trustee or Capital Farm Credit provided an argument for why or how the Gawliks' substantive rights changed upon conversion.

The *Conversion Orders* only changed the structural rules governing the Gawliks' reorganization cases. Post-conversion, each Debtor's case is governed by chapter 12 and not chapter 13. Conversion in this context is more like "an incidental procedural matter during the proceedings in the bankruptcy court" than a judgment that ends the litigation. ***Stewart v. Kutner (Matter of Kutner)***, 656 F.2d 1107, 1110–111 (5th Cir. Unit A 1981); *see also* **Ritzen**, 589 U.S. at 44 ("Courts, we agree, should not define 'proceeding' to include disputes over minor details about *how* a bankruptcy case will unfold.") (emphasis added). An order converting a case from one reorganization chapter (13) to another (12 or 11) is a preliminary step in the bankruptcy proceedings, not a final, appealable judgment impacting the substantive rights of the parties that determines the matters of the parties for res judicata purposes. The Court's *Conversion Orders*, which only moved the Debtors' cases from one reorganization chapter framework to another reorganization framework, therefore, are not final for res judicata purposes.[12]

Because the third element of res judicata is not met, the Court need not consider the fourth element's transactional test.

---

[12] The Court would note, however, that a conversion from a reorganization case to a liquidating case might not be treated the same.

### c. THE JUDGMENT DEBT'S EFFECT ON THE GAWLIKS' ELIGIBILITY

Ramos raises two arguments why each Debtor is not eligible to be a debtor in chapter 12. First the Judgment Debt cannot be a debt arising out of a farming operation because it includes damages for theft and breaches of fiduciary duty, which can never be related to a farming operation. Second the Judgment Debt was incurred in a "work for hire" context, not out of the Gawliks' farming operations. The Debtor, the Trustee, and Capital Farm Credit argue each Debtor need not own the farming operation from which the debts arose, it is enough to operate the farming operation (even if for another); and each Debtor operated Ramos's farming operations.

To be a debtor under chapter 12, a person must meet the family farmer definition in § 101(18). § 109(f). The definition includes a requirement that more than 50% of the person's aggregate, noncontingent, liquidated debts arise from a farming operation owned or operated by the person. § 101(18).

Each Debtor owns and operates his own farming operation—as of the petition dates each raised cattle and grew hay. § 101(21). The Court struggles to see, however, how the Judgment Debt owed to Ramos arose out of *each Debtor's* farming operation.[13]

While the Fifth Circuit has not directly defined the scope of "farming operation" or the debts that arise from a farming operation, other circuits have provided persuasive guidance. In *Armstrong*, the Seventh Circuit held that a debtor could not qualify as a family farmer because the debt at issue resulted from a venture capital investment in a seed company, not from actual farming activity. *Matter of Armstrong*, 812 F.2d 1024, 1030 (7th Cir. 1987). Although the business related to agriculture, the court found that the debt did not "arise out of a farming operation" as required by the statute. *Id*.

---

[13] Contrary to the Gawliks' arguments at the hearing, the issue centered on each Debtor's debts, not each Debtor's income.

The Tenth Circuit in *Woods* said: "a debt . . . arises out of a farming operation only if the debt is directly and substantially connected to the farming operation." *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 698 (10th Cir. 2014). A debt arises out of a farming operation if the proceeds of the debt were used or put back into the farming operation or were incurred as a result of operating the farm. *Id.* at 703.

The Eleventh Circuit in *Watford* emphasized that the determination of whether a debtor is engaged in a farming operation must be based on the totality of the circumstances. *Watford v. Fed. Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1529 (11th Cir. 1990). In that case, the court adopted a fact-intensive approach that considers whether the debtor's current and planned activities genuinely reflect farming activities. *Id.*

Relatedly, other courts have found that providing work-for-hire services for a farmer is different from being a family farmer for purposes of chapter 12 eligibility. *In re Van Air Flying Serv., Inc.*, 146 B.R. 816, 817–18 (Bankr. E.D. Ark. 1992) (debtor applied aerial pesticides for farmers); *In re Blackwelder Harvesting Co.*, 106 B.R. 301, 302–03 (Bankr. M.D. Fla. 1989) (debtor harvested oranges for farmers); *Federal Land Bank of Columbia v. McNeal (In re McNeal)*, 848 F.2d 170, 172 (11th Cir. 1988) (debtor cleaned chicken coops for farmers).

Here, the Judgment Debt arose from a lawsuit that ended with a jury finding the Gawliks stole Ramos's cows and hay and breached fiduciary duties they owed her (among other torts). The Court looks beyond the face of the Judgment Debt to examine the nature and scope of the Judgment Debt to find whether the tortious activity underlying the lawsuit arose out of each Debtor's farming operation. Multiple causes of action were brought and are reflected in separate damages awards in the state court judgment. For the purposes of this Opinion and Order, the Judgment Debt can

be split into two categories: damages arising out of farming operations and damages not arising out of farming operations.

### 1. THE PORTION OF THE JUDGMENT DEBT THAT DOES NOT ARISE OUT OF EACH DEBTOR'S FARMING OPERATION

Taking a pragmatic approach, considering the totality of the circumstances, and drawing realistic distinctions, the Court concludes the Gawliks' theft and George Jr.'s fraudulent filing do not arise out of a farm owned or operated by each Debtor. *Armstrong*, 812 F.2d at 1030–31; *Watford*, 898 F.2d at 1529.

The Tenth Circuit in *Woods* applied a direct-use test to determine whether a debt arises out of a farming operation. *Woods*, 743 F.3d at 703. The court believed this to be an objective test that met the direct-and-substantial-connection statutory standard required by Congress's "arising out of" language. *Id.*; *see also Arise*, BLACK'S LAW DICTIONARY, p. 115 (8th ed. 2004) (defining arise as "to originate; to stem from; to result from"). This direct-use test looks to whether the debt resulted from operating a farm or whether the proceeds from the debt were used in a farming operation. *Id.* (citing *In re Kan Corp.*, 101 B.R. 726, 727 (Bankr. W.D. Okla. 1988)).

Here, the amount of the Judgment Debt apportioned to the Gawliks' theft is not "inescapably interwoven" with farming operations. Each Debtor's farming operation can exist independent of the Judgment Debt. *Woods*, 743 F.2d at 701–02; *In re Reak*, 92 B.R. 804, 806 (Bankr. E.D. Wisc. 1988). The Gawliks' theft debt exists independent of the Gawliks' farming operations.

The amount of the Judgment Debt apportioned to the Gawliks' theft does not arise out of an initial loan to purchase farmland or equipment to get the farm up and running. *In re Teolis*, 419 B.R. 151, 161 (Bankr. D.R.I. 2009). It is unrelated to the Gawliks' failure to pay back some hypothetical loan taken out to operate a farm; secure the purchase of a tractor, trailer, or truck to

13

be used to further a farm's operations; or to cover the seed, fertilizer, or other attendant costs necessary to operate a farm. It likewise was not incurred as a result of, or contemporaneous with, acquiring the farming operation. *See* **In re Roberts**, 78 B.R. 546, 537 (Bankr. C.D. Ill. 1987) (debtor inherited a farm from her mother and the debt was estate taxes tied to that inheritance). The Judgment Debt also did not arise from a workman's compensation, premises liability, or general negligence claim—all of which would be a closer call than the one presented here.

The Gawliks' theft did not originate or stem from their operation of farms. It does not result from agriculture activity; it does not even result from raising cows or growing hay. It is not substantially connected to tilling, planting, fertilizing, irrigating, growing, harvesting, cutting, bailing, hauling, or selling crops; nor is it substantially connected to raising, herding, inseminating, birthing, tagging, transporting, or selling livestock. Rather, this portion of the Judgment Debt results from the Gawliks' stealing cows and hay. The operation at issue is more like a heist or an embezzlement scheme than crop or livestock production.

Likewise, the amount of the Judgment Debt apportioned to George Jr.'s filing of a fraudulent record does not arise out of George Jr.'s farming operation. The fraudulent record was not used to acquire farmland, or to further an effort to acquire a loan to purchase farmland or other farm equipment. Instead, it arises out of an attempt at forgery. George Jr. filed a contract for deed purporting to assert an interest in Ramos's property with the Wilson County records office, despite the filing's failure to meet certain legal requirements. This action does not genuinely reflect farming activity. It is independent of any purpose or business to raise crops or livestock. Filing this fraudulent record does not arise out of a farming operation, instead, it arises out of George Jr.'s malicious designs to defraud third parties. This fraudulent filing is not substantially connected to agricultural activity.

The entire Judgment Debt arises out of civil liability for the Gawliks' tortious misconduct.[14] It arises out of the Gawliks' theft of cows and hay; and George Jr.'s filing of a fraudulent record. The Judgment Debt arises out of each Debtor's own malicious bad acts. *See In re Bussman*, Case No. 21-61160, 2023 WL 2749696, at *5 (Bankr. D. Oregon 2023) (finding debts related to a debtor's bad acts are not farm debt). The portion tied to the Gawliks' theft and George Jr.'s fraudulent filing bears no connection to crop or livestock production. This type of debt is independent of the risks associated with operating a farm. It was not the rain or lack thereof that took the cows from the field or hay out of the ground, but the Gawliks who stole Ramos's cattle and hay for their own benefit. *See Armstrong*, 812 F.2d at 1028 (finding collecting rents did not expose risk to the landlord).

Stealing is not connected to the inherent risks of farming. Even if the Gawliks used the stolen cows to build up their own herd or the stolen hay to feed their own livestock or pay for their own farm operations, the only risk in stealing cows and hay is getting caught. If there is a drought or flood, or if the market dives, the Gawliks are not subject to the same risk as other legitimate farmers because they do not have the same invested. *See In re Poe*, Case No. 08-906, 2009 WL 2357160, at *6 (Bankr. N.D. W. Va. 2009) (finding boarding horses is not a farming operation). The Gawliks acquired the cows and hay without paying for them or working for them or otherwise earning them. Stealing cows and hay at best relates to the operation of another person's farm,

---

[14] The Tenth Circuit and the Western District of Oklahoma say a debtor's motives should not be considered for the direct-use test, and the Court agrees. **Woods**, 743 F.3d at 704; **Kan Corp.**, 101 B.R. at 727. It is not what a debtor intends to do that is central to this inquiry, rather it is what the debtor does that matters. If a debtor says he will borrow money to operate a farm, all the while intending to use the money to operate a wedding venue and did actually use it to operate a wedding venue, that *is not* farm debt. This is so, not because the debtor intended to deceive the lender, but because he actually deceived the lender and did not use the money to operate a farm. The logic holds true if the hypothetical were in reverse: if a debtor says he wants to borrow money to operate a wedding venue, but all the while intended to use it to operate a farm and did actually operate a farm, that *is* farm debt. The lender may have a nondischargeability claim, but it cannot claim the debt does not arise out of a farming operation. The debtor's actions are relevant for characterizing the debt, not his motives.

15

which, as stated earlier, does not qualify a person for chapter 12 eligibility. *See*, *e.g.*, ***Blackwelder Harvesting***, 106 B.R. at 302 ("[N]owhere in legislative history can one discern a Congressional intent to extend chapter 12 eligibility to any debtor dependent on farming operations owned and operated by others.").

The amount of the Judgment Debt apportioned to the Gawliks' theft does not arise out of each Debtor's operation of a farm. Instead, it arises out of theft. Likewise, the amount of the Judgment Debt apportioned to George Jr.'s filing of a fraudulent record does not arise out of George Jr.'s operation of a farm. Instead, it arises out of forgery and an attempt to defraud.

Cattle rustling and hay thievery are not legitimate farming operations, and they do not arise out of farming operations.

### 2. CALCULATING THE AMOUNT OF EACH DEBTOR'S NON-FARM DEBT

Having concluded the Gawliks' theft, George Jr.'s fraudulent filing, and the related consequences do not arise out of a farming operation owned or operated by each Debtor, the Court now turns to calculating the amount of the Judgment Debt not arising out of the operation of each Debtor's farm.[15]

#### A. KENNETH'S CALCULATIONS

The portion of the Judgment Debt for Kenneth's violations of the TTLA total $555,000. These damages for theft make up 89% of the damages award from the jury, not including the attorneys' fees and interest awards. Therefore, the Court will apportion 89% of the attorneys' fees, prejudgment interest, and post-judgment pre-petition interest awards to Kenneth's non-farm debt. *See* ***Bussman***, 2023 WL 2749696, at *5 (finding attorneys' fees related to a debtor's misconduct do not arise out of a farming operation). Eighty-nine percent of the attorneys' fees ($293,450.89),

---

[15] The Court has included a spreadsheet breaking down its calculations to the end of this Opinion and Order.

prejudgment interest ($21,849.66), and post-judgment pre-petition interest ($6,665.48) is $286,593.66. Bringing the total damages related to Kenneth's theft to $841,593.66.

Kenneth's Schedules show $908,255.66 in total debts. But including the unscheduled attorneys' fees award from the state court judgment, and any post-judgment pre-petition amounts that had accumulated, the total debt at the petition date was $1,208,372.03.

Because nearly 70% of Kenneth's debt consists of a portion of the Judgment Debt related to his theft, which does not arise out of his farming operation, he is not a family farmer under the Bankruptcy Code and is ineligible to be a debtor in chapter 12.

### B. GEORGE JR.'S CALCULATIONS

The portion of the Judgment Debt for Geroge Jr.'s violations of the TTLA and filing of a fraudulent record total $689,000. These damages make up 88% of the damages award from the jury, not including the attorneys' fees and interest awards. Therefore, as with Kenneth above, the Court will apportion 88% of the attorneys' fees, prejudgment interest, and post-judgment pre-petition interest awards to George Jr.'s non-farm debt. Eighty-eight percent of the attorneys' fees ($293,450.89), prejudgment interest ($71,993.84), and post-judgment pre-petition interest ($8,153.96) is $328,747.76. Bringing the total damages related to George Jr.'s debts not arising out of his farming operation to $1,017,747.76.

George Jr.'s Schedules show $1,187,374.20 in total debts. But including the unscheduled attorneys' fees award from the state court judgment, and any post-judgment pre-petition amounts that had accumulated, the total debt at the petition date was $1,488,979.05.

Because nearly 70% of George Jr.'s debt consists of the Judgment Debt related to his theft and fraudulent filing, which do not arise out of his farming operation, he does not qualify as a "family farmer" under § 101(18) and is ineligible to be a debtor in chapter 12.

17

## V. CONCLUSION

Because the Court's *Conversion Orders* are not final, the Court is not precluded from considering the Gawliks' eligibility for chapter 12. Because the Gawliks' theft and George Jr.'s fraudulent filing do not arise out of each Debtor's farming operation, and because the amount of each Debtor's portion of the Judgment Debt not arising out of each Debtor's farming operation exceeds the amount of debt arising out of each Debtor's farming operation, each Debtor is not eligible to be a debtor in chapter 12.

The Court will grant Ramos's *Amended Motions* and allow each Debtor time to convert to another chapter of the Bankruptcy Code. It is, therefore,

**ORDERED** that Ramos's *Amended Motion to Dismiss* (Case No. 24-51366, ECF No. 109; Case No. 24-51369, ECF No. 106) is **GRANTED** with leave to move to convert to another chapter of the Bankruptcy Code within 14 days of the entry of this Opinion and Order. It is further

**ORDERED** that, absent conversion within fourteen days, the above-captioned cases are **DISMISSED**.

# # #

| | A | B | C |
|---|---|---|---|
| 1 | **Damages awarded from the state court judgment** | **George Jr.** | **Kenneth** |
| 2 | Theft (TTLA violation) | $ 394,000.00 | $ 394,000.00 |
| 3 | Statutory Damages tied to Theft (attorneys' fees & costs) | $ 161,000.00 | $ 161,000.00 |
| 4 | **Total Theft Damages** | **$ 555,000.00** | **$ 555,000.00** |
| 5 | Breach of Fiduciary Duty | $ 94,000.00 | $ 68,500.00 |
| 6 | Filing Fraudulent Record | $ 134,000.00 | |
| 7 | **Total Damages, not including attorneys' fees and interest** | **$ 783,000.00** | **$ 623,500.00** |
| 8 | Pre-Judgment Interest | $ 71,993.84 | $ 21,849.66 |
| 9 | Attorneys' Fees | $ 293,450.89 | $ 293,450.89 |
| 10 | Pre-Petition Post-Judgment Interest (1 month) | $ 8,153.96 | $ 6,665.48 |
| 11 | **Total Damages not arising out of farming operation** | **$ 689,000.00** | **$ 555,000.00** |
| 12 | **Total Judgment Debt as of petition date** | **$ 1,156,598.69** | **$ 945,466.03** |
| 13 | | | |
| 14 | **Percent of Total Theft damages over Total Damages, not including interest and attorneys' fees (B4/B7) or (C4/C7)** | 70.88% | 89.01% |
| 15 | | | |
| 16 | Percent of Total Damages not arising out of farm operations over Total Damages, not including interest and attorneys' fees (B11/B7) or (C11/C7) | 87.99% | 89.01% |
| 17 | | | |
| 18 | Portion of pre-judgment interest attributed to damages not arising out of a farming operation (B8*B16) or (C8*C16) | $ 63,350.90 | $ 19,449.18 |
| 19 | Portion of attorneys' fees award attributed to damages not arising out of a farming operation (B9*B16) or (C9*C16) | $ 258,221.79 | $ 261,211.30 |
| 20 | Portion of post-judgment pre-petition interest not arising out of a farming operation (B10*B16) or (C10*C16) | $ 7,175.07 | $ 5,933.19 |
| 21 | **Portion of attorneys' fees and all interest attributed to damages not arising out of farm operations (B18:B20) or (C18:C20)** | **$ 328,747.76** | **$ 286,593.66** |
| 22 | | | |
| 23 | **Total for damages not arising out of farming operation and share of apportioned attorneys' fees and all interest (B11 + B21) or (C11 + C21)** | **$ 1,017,747.76** | **$ 841,593.66** |
| 24 | | | |
| 25 | **Total Debts listed on the Debtor's schedules** | **$ 1,187,374.20** | **$ 908,255.66** |
| 26 | **Total Debts as of the Petition Date (inlcuding what is listed on the Debtor's schedules and attorneys' fees and post-judgment pre-petition interest)** | **$ 1,488,979.05** | **$ 1,208,372.03** |
| 27 | | | |
| 28 | **Percent of damages not arising out of farming operation and share of apportioned attorneys' fees and interest over Total Debts as of the Petition Date** | 68.35% | 69.65% |